UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:15-cr-00050-TLS-SLC |
| | ) | |
| CHRISTOPHER E. COOK | ) | |

**REPORT AND RECOMMENDATION**

Before the Court is a motion to suppress (DE 25) filed by Defendant Christopher E. Cook. Cook seeks to suppress statements that he made to a police detective and an FBI agent who confronted and questioned him at the Indiana State Parole Office on March 19, 2015, when he appeared there for a scheduled appointment with his parole officer. Cook contends that these statements were obtained as a result of a custodial interrogation without *Miranda* warnings.[1]

*A. Background*

On September 23, 2015, Cook was indicted for a violation of 21 U.S.C. § 846, conspiracy to distribute and possess with the intent to distribute heroin, a Schedule I Controlled Substance; cocaine, a Schedule II Controlled Substance; and marijuana, a Schedule I Controlled Substance. (DE 1). On September 29, 2015, Cook pleaded not guilty to the charges. (DE 10). On May 24, 2016, Cook filed the present motion (DE 25); the government filed a response in opposition to Cook's motion (DE 27) on June 7, 2016; and Cook then filed a reply to the government's

---

[1] Initially, Cook also moved to suppress the evidence obtained via use of tracking devices and search warrants for telephone matters, arguing that the affidavits supporting the search warrants fail to constitute probable cause due to various deficiencies and a lack of particularity in the affidavits, and that the officers made misstatements in the affidavits in that they failed to advise the judge that they were unable to identify the parties involved in the conversations, texts, and tracking. However, the Court in its Order dated November 7, 2016, found that an evidentiary hearing was not warranted on these matters (DE 37), and Cook has since abandoned these arguments in his post-hearing briefing (DE 43; DE 45).

response (DE 32) on July 15, 2016. The District Judge referred this matter to the undersigned Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72-1. (DE 28).

On November 9, 2016, the Court conducted an evidentiary hearing with respect to Cook's motion to suppress his statements made to the detective and the agent who confronted and questioned him at the Indiana State Parole Office.[2] (DE 38). On March 6, 2017, Cook filed a post-hearing brief in support of his motion to suppress. (DE 43). The government filed its response on April 6, 2017. (DE 44). Cook filed his reply brief on April 19, 2017. (DE 45). After considering the evidence and argument submitted by the parties in this matter, I RECOMMEND that Cook's motion to suppress be DENIED.

## B. *Findings of Fact*

At the evidentiary hearing, the government offered the testimony of Adalberto Martinez, a detective with the Indiana State Police who had been assigned to the FBI Safe Streets Task Force since 2010. (Tr. 7). Detective Martinez has worked for the Indiana State Police since 2003 and has significant training and experience with sophisticated Mexican drug conspiracies. (Tr. 7). The government also offered the testimony of James Keszei, a special agent with the FBI. (Tr. 56). Special Agent Keszei is a 14-year veteran with the FBI and has a great deal of experience working with traditional Italian organized crime and Mexican drug trafficking cartels. (Tr. 57-58). The testimony of Detective Martinez and Special Agent Keszei (together, "the Agents") was not contested in any meaningful way at the hearing, and I FIND their testimony to be entirely credible.

---

[2] The Court will refer to the transcript of the hearing (DE 40) as "Tr. __."

2

Cook offered the testimony of Kelli Simon, a senior parole agent with the State of Indiana. (Tr. 84). Simon supervises individuals, including Cook, who have been convicted of sex-related offenses and have been given a set of stipulations to follow; her job is to ensure that they follow those stipulations. (Tr. 85). Cook came under Simon's supervision when he was transferred from the Indiana Department of Corrections confinement to parole supervision, which was several months before Cook's interview with the Agents on March 19, 2015. (Tr. 85-86). While on parole, Cook was required to comply with all parole supervision requirements, plus an additional 27 stipulations due to the fact that he was a sex offender. (Tr. 93). Simon's testimony was not contested in any meaningful way at the hearing, and I FIND her testimony to be entirely credible.

Sometime before March 19, 2015, Detective Martinez called Simon and asked whether Cook would be coming into the parole office at any time, stating that the Agents had some questions they would like to ask him. (Tr. 86-87). More particularly, Detective Martinez informed Simon that the FBI was investigating a large drug conspiracy, that the Agents wanted to talk with Cook about the drug conspiracy, and that they were not going to arrest Cook.[3] (Tr. 14). The Agents wanted to conduct the interview at the parole office where Simon worked,

---

[3] The Agents wanted to gain Cook's assistance in investigating a large drug conspiracy led by Allen Bates and hoped that Cook would help them to disrupt the cartel's ongoing distribution operation. (Tr. 10, 13, 61). Bates was coordinating large cocaine, heroin, and marijuana shipments from Texas and Mexico to a northern Indiana warehouse for distribution in Indiana, Ohio, and Michigan. (Tr. 10-12). The investigation culminated in seizures of large amounts of money and drugs on January 27, 2015, but Bates evaded officers and escaped arrest. (Tr. 10-11). Bates fled to Mexico, and the Agents learned through search warrants for Bates's stored text messages that Bates continued to direct his drug operation from Mexico. (Tr. 11-12). In the texts, Bates was talking to an individual—who was later identified as Cook—about acquiring a new warehouse to offload the incoming drug shipments. (Tr. 12-13). Once Cook was identified through a telephone tracking warrant and surveillance, the Agents learned that he was on parole through the State of Indiana. (Tr. 13-14, 42-43).

located at 3111 East Coliseum Boulevard, Fort Wayne, Indiana, because of concerns involving safety and the risk of compromising the investigation and Cook's potential cooperation. (Tr. 15). The drug conspiracy was a sophisticated operation which employed counter surveillance, and the Agents risked Cook's safety and the integrity of the investigation if a drug conspirator saw Cook in contact with the Agents.[4] (Tr. 15-16, 54).

Simon responded to Detective Martinez that "yes, [Cook] could come in," indicating that she "could schedule something to have him come in if he wasn't already coming in." (Tr. 87). Simon could not recall whether Cook was scheduled to come in, or "due to the questioning being drug related, [she] called and asked him to come in for a drug screen." (Tr. 87). It was normal procedure for Simon to ask a parolee to come in for a urine screen if Simon received information about a parolee's potential drug involvement, and one of Cook's conditions of parole was to submit to urine testing at the discretion of the parole officer. (Tr. 98). Simon arranged that Cook would come in to the parole office on March 19, 2015. (Tr. 87). Simon did not inform Cook of the Agents' interest in interviewing him. (Tr. 88). Simon then informed the Agents of the date and time that Cook was scheduled to appear. (Tr. 87).

The parole office building where Simon worked and where Cook was to appear is located in a commercial and residential area, rather than downtown near the jail or police stations. (Tr. 16-22; Exs. 1-5). The building is surrounded by an accounting firm, a beauty salon, a music store, a gas station, a church, a restaurant, healthcare offices, and a nursing home; nearby are residential housing areas and two college campuses, Indiana University-Purdue University Fort

---

[4] Demonstrating the extent of the drug organization, agents seized close to 150 kilograms of cocaine and over $6.3 million in cash from the Bates organization. (Tr. 61).

4

Wayne and Brown Mackie College. (Tr. 16-22; Exs. 1-5). The building faces East Coliseum Boulevard, which is a multi-lane highway. (Exs. 1-5). There are no gates or fences surrounding the building or its parking lot, and thus, the public can approach the building; the building's setting includes trees and a pond. (Tr. 16-23; Exs. 1-5).

When the Agents arrived at the parole office on March 19, 2015, there were no police vehicles in the parking lot. (Tr. 24). The sign on the front of the building identified the location as the parole office building and included the governor's name. (Tr. 25; Ex. 4). The front door was accessible to the public, as the Agents simply opened the front door and walked into the lobby of the building. (Tr. 23). Once inside, there was a waiting area, and visitors had to check in with a receptionist at a window; there were no security officers in the lobby. (Tr. 23, 79). A locked door separated the lobby from the internal offices, and visitors had to be buzzed through this locked door to enter the internal offices. (Tr. 24). This same door, however, freely opened when accessing it from the other side; that is, a person could simply open the door from the internal offices, enter the lobby, and exit the building. (Tr. 24). The internal office area looked similar to any other office, with cubicles, doorways, and a conference room. (Tr. 24-25). Inside the conference room was a long conference table, a television on a stand, and other supplies. (Tr. 25). The conference room had two entry doors, each equipped with a "thumb lock" on the conference-room side; so to exit the conference room, if the door was locked, a person could "just turn the lock and walk out." (Tr. 89).

While the Agents were in the lobby, they saw Cook enter the lobby from the outside and sign in with the receptionist; the Agents did not speak with Cook. (Tr. 26, 63). The Agents were brought back to the conference room where they waited for Cook. (Tr. 88). Simon brought Cook through the locked lobby door and into the internal office area. (Tr. 88). Simon first took Cook to the "shake down" room where Cook was asked to remove everything from his pockets

5

and Simon used a metal detector wand on Cook and his clothing to ensure that he had no weapons; Simon did not put her hands on Cook during the search. (Tr. 88, 100-01). This was Simon's normal procedure each time that Cook—or any other parolee under her supervision—visited the parole office. (Tr. 88, 100-01).

After the search for weapons, Simon accompanied Cook to the conference room, which is where she usually met with him during his visits. (Tr. 26, 63, 100, 102). Simon explained to Cook that there were two individuals waiting in the conference room to speak with him. (Tr. 63, 89). It was at this point that Cook learned that his visit was not just a routine meeting with Simon. (Tr. 89). The Agents introduced themselves, and Simon exited, telling Cook that she would like to speak with him after he was finished with the Agents. (Tr. 89). Cook was alone with the Agents in the conference room during the interview, which lasted approximately 30 minutes. (Tr. 26-27, 63, 104). Because the Agents wanted to treat Cook more like a cooperating witness than a suspect, the interview was not recorded. (Tr.71-72). The doors to the conference room remained closed throughout the interview (Tr. 27); the record is unclear whether the "thumb locks" on the conference room doors were engaged at the time. (Tr. 27, 73, 89).

In the conference room, Cook sat toward the head of the table with an exit door approximately four feet behind him. (Tr. 27). The Agents sat next to each other along the side of the table close to Cook; the Agents were not seated between Cook and the exit door. (Tr. 27, 62). The Agents were dressed casually, wearing jeans and khaki pants, sweatshirts or jackets, and tennis shoes; their handguns were concealed. (Tr. 28, 63-64). The Agents did not touch Cook during the interview, and they remained seated until the interview had ended. (Tr. 29, 62). The interview began with the Agents showing Cook their identification. (Tr. 28). Special Agent Keszei explained that they wanted to talk with Cook about Bates and Bates's drug ring, hoping that Cook would help the Agents as a cooperator. (Tr. 28-29, 64). Special Agent Keszei

6

explicitly told Cook that the Agents were not there to arrest him. (Tr. 29).

Next, the Agents asked Cook how he had met Bates; Cook responded that they had met while in prison in 2004. (Tr. 30). Bates had loaned $5,000 to Cook when Cook was released from prison, and to repay Bates, Cook was going to do some construction work on Bates's rental properties. (Tr. 30-31). However, at some point, Cook and Bates stopped talking to each other. (Tr. 31). Cook stated that his relationship with Bates reignited after he saw Bates at a gas station in September or October 2014; Cook was going to install some carpet in a rental house for Bates. (Tr. 31).

Cook stated that after Bates fled to Mexico in January 2015, a person with the last name of Hernandez appeared at Cook's residence and handed him a phone to speak to Bates. (Tr. 32). Cook stated that Bates asked him to pick up a trailer, to look for tracking devices on the trailer, to pick up a dump truck, to check on Bates's house, to snowplow Bates's driveway, to meet with certain individuals, and to buy minutes for Bates's cellular telephone. (Tr. 32-33). Some of these topics were discussed in conjunction with the Agents showing Cook relevant text messages from Bates's phone; the Agents had obtained these text messages from the telephone company. (Tr. 32-33). Cook was cooperative with the Agents when sharing this information, conversing normally, and he did not display signs of being nervous. (Tr. 32-33, 48).

As the interview progressed, however, there was a point where Cook became upset and uncooperative. (Tr. 36, 70). This occurred when the Agents started asking him about setting up a warehouse to offload drugs and the more explicit text messages concerning the warehouse and distribution. (Tr. 36, 38). The Agents observed that Cook did not want to answer questions pertaining to the text messages about the warehouse and the new distribution point for the warehouse and its location. (Tr. 36). At this point, Cook was "shaking and crying." (Tr. 37). Cook expressed fear of Bates's drug organization, stating that the Agents could not protect him

7

because he was on the sex offender registry and could always be found. (Tr. 37-38). One of the text messages from Bates asked for photographs of Cook's family, with Bates texting Cook that "these cartel guys don't mess around." (Tr. 71). Cook asked if the Agents could remove him from the sex offender registry, but the Agents did not know if that was possible. (Tr. 37-38). It became obvious that Cook was afraid and did not want to talk with the Agents any longer. (Tr. 36).

The Agents then ended the interview, instructing Cook that if anybody threatened him or he thought he was in danger, he needed to contact the police. (Tr. 37). Cook was not provided with *Miranda* warnings, and he never asked for a lawyer. (Tr. 47, 81). He never asked to leave or to use the telephone; his parole supervision never came up during the interview. (Tr. 38, 72). The Agents did not ask Cook to move locations, nor did they obtain any identification or documents from him. (Tr. 38). After the interview ended, the Agents followed Cook through the conference room door; the Agents then walked through the internal office door to the lobby and exited the building. (Tr. 73).

Simon observed that after his meeting with the Agents, Cook was "very upset" and "was tearful and crying." (Tr. 103). Cook told her that the Agents "were asking him to help, and he didn't know whether to help them." (Tr. 103). He was concerned that if he helped the FBI, the persons involved in the drug conspiracy "might try to go after his family," but that if he did not help the FBI, he could not tolerate going back to prison. (Tr. 103-04). Therefore, "[h]e just didn't know what to do." (Tr. 104). Simon responded that she did not want to get involved and could not give him any advice, commenting that he had gotten himself into an unfortunate situation and that he would have to make the decision on his own. (Tr. 103-04).

While Cook was meeting with the Agents, Simon talked with her supervisor and they concluded that Cook should be placed on a GPS ankle bracelet, which is a form of stricter

supervision.[5] (Tr. 89-90). This was not due to any misconduct on Cook's part, but rather, because he was involved, at least to some extent, in an investigation. (Tr. 90). Simon explained at the hearing that "had allegations proceeded and nothing occurred, then we would have removed him from the GPS." (Tr. 90). Simon did not discuss the GPS monitoring with Cook until after his interview with the Agents had ended. (Tr. 39, 53, 89, 97). Simon also increased the frequency of Cook's reporting from monthly to weekly. (Tr. 90). After the GPS ankle bracelet was fitted and a urine test was completed,[6] Cook walked out of the parole office. (Tr. 102).

Six months later, Cook was charged with conspiracy to distribute and possess with the intent to distribute heroin, cocaine, and marijuana. (DE 1). This was after the Agents learned through their interviews of other witnesses that Cook was more involved in Bates's drug organization than initially suspected. (Tr. 59-61).

*C. The* Miranda *Standard*

"In the seminal case of *Miranda*, the United States Supreme Court held that 'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination.'" *United States v. Patterson*, 826 F.3d 450, 454 (7th Cir. 2016) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). "The *Miranda* Court recognized that the inherently coercive nature of custodial interrogation could

---

[5] Cook had already experienced several instances of electronic monitoring, as sex offenders generally have six months of electronic monitoring when first on parole supervision. (Tr. 86, 94). An electronic monitoring chart shows that Cook was on supervision in December 2013 and that monitoring was last deactivated in January 2015. (Tr. 95, Ex. B).

[6] Conducting a urine test was part of Simon's normal procedure for a parolee visit. (Tr. 101-02).

9

blur the line between voluntary and involuntary statements, and that the prophylactic measures were necessary to protect the constitutional right." *United States v. Ambrose*, 668 F.3d 943, 954 (7th Cir. 2012) (citing *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2401 (2011)).

However, "*Miranda* warnings are not required merely because the person being questioned is a suspect or the focus of a criminal investigation." *Id*. (citing *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006)). "The privilege against self-incrimination is not imperiled by every conversation with the government. Instead, the concern in *Miranda* was with the inherently coercive nature of custodial interrogation." *Id*. "Accordingly, a suspect must be both in custody and subjected to interrogation before *Miranda* warnings are required." *Id*. (citing *Berkemer v. McCarty*, 468 U.S. 420, 428 (1984); *Miranda*, 384 U.S. at 444; *Barker*, 467 F.3d at 628); *see also Patterson*, 826 F.3d at 454.

## D. Discussion

Here, the parties do not dispute that Cook was subjected to interrogation. Therefore, the Court's inquiry is limited to whether Cook was "in custody" at the time of his interview with the Agents at the parole office. (*See* DE 43 at 3-8; DE 44 at 1); *see*, *e.g.*, *Patterson*, 826 F.3d at 454 (observing at the outset that the only issue in dispute was whether Patterson was "in custody" at the time of his interview at the FBI office).

"A person is 'in custody' for *Miranda* purposes if there was a formal arrest or a restraint on his or her freedom of movement of the degree associated with a formal arrest." *Patterson*, 826 F.3d at 455 (quoting *Ambrose*, 668 F.3d at 956); *see also United States v. Snodgrass*, 635 F.3d 324, 327 (7th Cir. 2011) ("For *Miranda* purposes, a suspect is 'in custody' when he is 'deprived of his freedom of action in any significant way.'" (quoting *United States v. Thompson*, 496 F.3d 807, 810 (7th Cir. 2007))). "To determine whether [Cook] was in custody, we use the objective test of whether a reasonable person under the same circumstances as [Cook] would

10

have felt free to leave." *Patterson*, 826 F.3d at 455 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 662-63 (2004); *Ambrose*, 668 F.3d at 954-55; *Barker*, 467 F.3d at 628); *see also Snodgrass*, 635 F.3d at 327 ("[W]e inquire whether, under the totality of circumstances, a reasonable person in the defendant's position would have believed that he was free to leave." (citing *United States v. Budd*, 549 F.3d 1140, 1145 (7th Cir. 2008))).

This inquiry is "an objective test that asks how a reasonable person in the [defendant's] position would have understood the situation." *Ambrose*, 668 F.3d at 954 (citations omitted). "In determining whether a reasonable person in the [defendant's] shoes would have felt free to leave, we consider 'all of the circumstances surrounding the interrogation.'" *Patterson*, 826 F.3d at 455 (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)). Factors to be considered when assessing the totality of the circumstances include: "(1) the location of the interrogation; (2) the duration of the interrogation; (3) any statements made by the suspect during the interrogation; (4) any use of physical restraints during the interrogation; and (5) whether the suspect was released at the end of the interrogation." *Id.* (citing *Howes*, 565 U.S. at 509). In that regard, the Seventh Circuit has provided a non-exhaustive list of example factors, including:

> whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed.

*Id.* (citations omitted).

Here, Cook did not invite the interview or consent to it in advance. Rather, he came to the parole office building for what he believed would be a regular meeting with his parole officer. *See Ambrose*, 668 F.3d at 956 (procuring a suspect's presence at an interview through the use of a ruse weighs against voluntariness). Nor was Cook advised that he was free to

11

decline to speak with the Agents, and Simon told Cook at the outset of the interview that she would like to speak with him after he was finished with the Agents. Thus, Cook's argument that he was "in custody" for *Miranda* purposes is not without at least some support. Ultimately, however, these factors are offset by other factors weighing in favor of voluntariness. *See Howes*, 565 U.S. at 514-15 (articulating that the fact that defendant did not invite or consent to the interview in advance and that defendant was not advised that he could decline the interview both weighed in favor of custody, but finding that these factors were ultimately offset by other factors weighing in favor of voluntariness).

In that regard, a defendant's obligation to appear before his probation or parole officer does not, by itself, convert voluntary statements into compelled ones. *See Howes*, 565 U.S. at 512 ("[S]tandard conditions of confinement and associated restrictions on freedom will not necessarily implicate the same interests that the Court sought to protect when it afforded special safeguards to persons subjected to custodial interrogation. Thus, service of a term of imprisonment, without more, is not enough to constitute *Miranda* custody."). Cook was on parole supervision as a sex offender. As such, Cook was regularly questioned about his past activities during his visits to the parole office building. *See Minnesota v. Murphy*, 465 U.S. 420, 432 (1984) ("[T]he nature of probation is such that probationers should expect to be questioned on a wide range of topics relating to their past criminality.").

In *Murphy*, the Supreme Court explained that a defendant on probation who must attend a meeting with his probation officer is subjected "to less intimidating pressure than is imposed on grand jury witnesses, who are sworn to tell the truth and placed in a setting conducive to truth telling," and "we have never held that [*Miranda* warnings] must be given to grand jury witnesses." 465 U.S. at 431 (citation omitted) ("It is unlikely that a probation interview, arranged by appointment at a mutually convenient time, would give rise to a similar impression

[of custodial arrest]."). The Supreme Court explained that while Murphy was "subject to a number of restrictive conditions governing various aspects of his life" and "would be regarded as 'in custody' for purposes of federal habeas corpus," "custody for *Miranda* purposes has been more narrowly circumscribed." *Id*. (citation omitted). The Court concluded that "[u]nder the narrower standard appropriate in the *Miranda* context," it was clear that Murphy was not in custody when he made incriminating responses during a meeting with his probation officer.[7] *Id*. (citation omitted).

Weighing in favor of voluntariness, Cook's encounter with the Agents took place in a setting familiar to him—the parole office building. *See id.* at 433 (considering as a factor that the interrogation took place at the probation office where the defendant regularly met with his probation officer, and that such familiarity served to insulate the defendant from psychological intimidation that might overbear his desire to assert the privilege). As a parolee, Cook was accustomed to attending regular meetings at the parole office, where routinely he was searched for weapons in the "shake down" room, given a urine test, and questioned by his parole officer. *See, e.g.*, *United States v. Newton*, 369 F.3d 659, 676 (7th Cir. 2004) ("As a parolee, Newton was accustomed to parole officers coming to his home to ask questions in connection with his supervision . . . ."). The parole office building is set in a commercial and residential area, not downtown near a police station or the jail, and the public can freely enter the lobby of the parole office. *See United States v. Cranley*, 350 F.3d 617, 620 (7th Cir. 2003) ("If the [probation]

---

[7] Cook attempts to distinguish probation from parole, asserting that "under Indiana law" a person on parole is always "in custody" for *Miranda* purposes. (DE 45 at 6-7). This argument is unpersuasive. The Supreme Court has held that even incarceration is not necessarily enough to create a custodial situation for *Miranda* purposes. *See Howes*, 565 U.S. at 508 ("In sum, our decisions do not clearly establish that a prisoner is always in custody for purposes of *Miranda* whenever a prisoner is isolated from the general prisoner population and questioned about conduct outside the prison.").

office shares the building with the local jail or police department, or even a courthouse, that is one thing, but if it shares it with offices unrelated to law enforcement . . . that is quite another, muting the impression that the probation service is a branch of the state correctional authority.").

Furthermore, Cook was interviewed in the same conference room in which he regularly met with his parole officer, and he was not moved during the interview. As such, while the doors to the conference room remained closed during the interview, Cook would have known that the conference room doors, as well as the door from the inner office area to the lobby from his direction, were not locked in a manner that would prevent his exit. *See Patterson*, 826 F.3d at 457 ("[T]he FBI conference room was a private space, but this factor has minimal weight . . . . Patterson was never restrained while in the conference room. The front door to the FBI office and the door to the conference room remained unlocked from the inside and could be exited via common door handles." (citing *Ambrose*, 668 F.3d at 957)). Additionally, Cook sat close to a conference room door, and thus, the Agents did not obstruct his ability to exit the conference room. *See Ambrose*, 668 F.3d at 957 (considering the fact that the officers used a spacious conference room for the meeting—in contrast to a locked, secured interview room—that did not physically prevent defendant's exit or suggest that he was under arrest); *United States v. Baxter*, 982 F. Supp. 2d 886, 897 (E.D. Wis. 2013) (noting a significant difference between the mere closure of a door versus officers sitting in a chair blocking a door). These facts all weigh in favor of voluntariness and against custody. *See Murphy*, 465 U.S. at 433 ("Since Murphy was not physically restrained and could have left the office, any compulsion he might have felt from the possibility that terminating the meeting would have led to revocation of probation was not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator.").

Although the Agents did not specifically tell Cook that he could terminate the interview

14

or refuse to answer questions, they did tell him at the outset of the interview that they were not there to arrest him. *See United States v. Borostowski*, 775 F.3d 851, 862 (7th Cir. 2014) (stating the fact that defendant was told he was not under arrest or in custody weighed in favor of voluntariness); *United States v. Littledale*, 652 F.3d 698, 702 (7th Cir. 2011) (considering that although the agents did not tell defendant he was free to leave, they did assure him he was not under arrest, which weighed against custody). Cook did not object to the interview after he was introduced to the Agents, and he spoke freely with the Agents during most of the interview. Furthermore, the length of the interview was short—about 30 minutes. *See Stechauner v. Smith*, 852 F.3d 708, 711, 716 (7th Cir. 2017) (characterizing a 90-minute interrogation as "relatively short," which weighed in favor of voluntariness). These facts all weigh in favor of voluntariness.[8]

Also weighing in favor of voluntariness, the Agents did not convey a threatening presence. They wore casual clothes, and they did not display any weapons. *See Ambrose*, 668 F.3d at 957-58 (considering that the agents worse business clothes, rather than uniforms). Their

---

[8] Cook asserts that a Ninth Circuit case, *United States v. Barnes*, is strikingly similar to the instant circumstances. 713 F.3d 1200 (9th Cir. 2013). There too, the defendant was told to come in for a meeting with his parole officer, but when he arrived, two FBI agents were there waiting to question him concerning his involvement in drug distribution at the Alaska airport. The Court ultimately found that Barnes was in custody for *Miranda* purposes during the interview. *Id.* at 1204-05.
    Several factors in *Barnes*, however, are distinguishable from those present here. Barnes normally had brief parole visits through a window in the lobby without undergoing a weapons search; however, on the day of the FBI interview, Barnes was searched, escorted through an electronically locked door, and then interrogated for two hours in a small, confined office by two agents who promptly confronted him with evidence of his guilt. *Id.* at 1204. Additionally, Barnes's parole officer told him at the outset that it was important that he cooperate with the agents. *United States v. Barnes*, 3:09-CR-00001-TMB-DMS, 2009 WL 10661754, at *4 (D. Alaska Oct. 21, 2009), *rev'd,* 713 F.3d 1200.
    Here, however, Cook's interview took place in the same conference room in which he regularly met with his parole officer, he underwent the same weapons search that he did at all of his visits, the interview lasted just 30 minutes, and there were no statements made directing him to cooperate with the Agents. Thus, there are several facts contributing to coerciveness in *Barnes* that are not present in the instant case. Moreover, *Barnes* is a case from the Ninth Circuit, not the Seventh Circuit, and thus, it is not controlling precedent. *See generally Auten v. Steigmann*, No. 11–3013, 2011 WL 692241, at *4 (C.D. Ill. Feb. 18, 2011) ("[D]istrict courts within the Seventh Circuit are bound by that Circuit's precedent, and not precedent from other Circuits.").

15

tone was cooperative and never became hostile or combative. *See id.* (considering that the officers' tone during the encounter never became hostile or combative); *Borostowski*, 775 F.3d at 860 (same); *Littledale*, 652 F.3d at 702 (same). The Agents did not threaten Cook, touch him, or use any physical force, and they remained seated until the end of the interview. *See Littledale*, 652 F.3d at 702 (considering that although the officers carried holstered weapons, there was no display of force or physical touching). Cook decided to stop the interview when the Agents asked about the warehouse because he feared retaliation from the drug cartel, *not* retaliation from the Agents.

Weighing even more significantly in favor of voluntariness, Cook left the parole office building after the interview, after he met with Simon. *See Patterson*, 826 F.3d at 458 ("Patterson left after the interrogation, which weighs against a custody finding."). Although his departure after the interview was not immediate because he had to meet with Simon and take a urine test, these same restraints would have occurred even he if had not met with the Agents, as these restraints were normal conditions of his parole. Thus, that Cook resumed his regular visit with Simon after he left the interview with the Agents merely restored the status quo. *See Howes*, 565 U.S. at 515-16 (observing that although an inmate had to wait 20 minutes for an officer to escort him from the conference room to his cell after police questioning, this did not undercut his voluntariness, as this same restraint would have been in place even if the inmate had gone to the conference room for some reason other than police questioning); *United States v. Rainey*, 404 F. App'x 46, 56 (7th Cir. 2010) (concluding that the defendant's statements to detectives at the probation office were voluntary given the familiar setting of the office, the non-coercive manner in which she was brought to the office, and the detectives' statements that she was free to leave, even though the probation officer brought her to the probation office ostensibly for a urine test but actually for an interview with the detectives); *United States v. Cox*, 322 F. Supp. 2d 832, 837

16

(E.D. Mich. 2004) ("[H]aving to check with a state probation officer before leaving a state probation office would not cause a reasonable person to feel that he was unable to terminate and leave a federal law enforcement officer's interrogation." (citations omitted)).

The fact that Cook was placed on a stricter form of supervision in the form of GPS monitoring and weekly visits after the interview also does not change the voluntariness of Cook's statements. The decision to change his supervision was made by Simon and her supervisor, not the Agents, and Cook was not informed of this change until *after* the interview with the Agents had ended. The Agents did not discuss Cook's parole supervision during the interview or suggest that Cook would suffer some type of consequence concerning his parole. *See Murphy*, 465 U.S. at 435 (stating that fear of revocation is not a ground for ruling that a probationer's confession deprived him of his Fifth Amendment privilege, provided that the officers did not tell the probationer that his probation would be revoked if he refused to talk); *Cranley*, 350 F.3d at 622 ("[A] merely plausible fear that invoking one's Fifth Amendment privilege will get one into trouble with probation authorities is not a heavy enough penalty to excuse the failure to assert the privilege." (citing *Murphy*, 465 U.S. at 436)); *United States v. Humphrey*, 34 F.3d 551, 555 (7th Cir. 1994) (rejecting parolee's argument that *Miranda* warnings were required because "he felt obligated to cooperate" with the agents, where there was no evidence that the agents would have reported him as having violated his parole if he refused to answer the questions).

In sum, the totality of the circumstances of Cook's interaction with the Agents at the parole office building do not rise to the level of having restrained Cook's freedom of movement akin to a formal arrest. A reasonable person would have felt free to terminate the interview with the Agents and leave after meeting with his parole officer—that is, returning to the status quo. Cook's interaction with the Agents "had no indicia of compulsion or government overreaching,

17

such as violence, threats, promises, or unduly protracted interrogation." *Patterson*, 826 F.3d at 459 (citation omitted). Cook was therefore not in custody for *Miranda* purposes when he came to the parole office building for a meeting with his parole officer and was interrogated in the conference room by the Agents. Consequently, I will recommend that Cook's motion to suppress be denied.

*E. Conclusion*

For the above reasons, I CONCLUDE that Cook's statements were not obtained in violation of *Miranda*. I therefore RECOMMEND that Cook's motion to suppress (DE 25) be DENIED.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties. NOTICE IS HEREBY GIVEN that within 14 days after being served with a copy of this recommended disposition, a party may serve and file specific, written objections to the proposed findings and recommendations. Fed. R. Crim. P. 59(b)(2). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.

Entered this 18th day of May 2017.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge